**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                    :
MELISSA ANN PETRO,                  :          CIVIL ACTION
                    Plaintiff,      :
                                    :
        v.                          :          NO. 09-2900
                                    :
MICHAEL J. ASTRUE,                  :
COMMISSIONER OF THE                 :
SOCIAL SECURITY ADMINISTRATION,     :
                    Defendant.      :
_____:

HENRY S. PERKIN
UNITED STATES MAGISTRATE JUDGE

### REPORT AND RECOMMENDATION

        Plaintiff, Melissa Ann Petro ("Plaintiff"), brings this
action under 42 U.S.C. § 1383(c)(3), which incorporates 42 U.S.C.
§ 405(g) by reference, to review the final decision of the
Commissioner of Social Security ("Defendant"), denying her claim
for disability insurance benefits ("DIB") and supplemental
security income ("SSI") provided under Titles II and XVI of the
Social Security Act ("the Act").  42 U.S.C. §§ 401-433, 42 U.S.C.
§§ 1381-1383f.  Subject matter jurisdiction is based upon section
205(g) of the Act.  42 U.S.C. § 405(g).  Presently before this
Court is the Plaintiff's Request for Review and Brief in Support
thereof and the Defendant's Response.  For the reasons that
follow, it is recommended that the case should be remanded.

## I.   PROCEDURAL HISTORY.

        Plaintiff filed an application for benefits under Title
II for DIB on September 28, 2006, alleging disability since July

30, 2006, due to a mood disorder fatigue, muscle body aches, headaches, anxiety, depression and joint pain.[1] (R. 54, 56, 60.) Plaintiff filed an application for SSI benefits on March 20, 2007. The medical evidence indicates that Plaintiff also suffers from fibromyalgia[2] and trochanteric bursitis.[3] Plaintiff's DIB application was denied at the initial level on December 20, 2006. (R. 95-98, 88-94.) On January 24, 2007, Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (R. 66.) A hearing was held by ALJ Suanne S. Strauss on May 2, 2008. (Id. at 26-53.) Appearing at the hearing and offering testimony were Plaintiff, who was represented by counsel and Carolyn E. Rutherford, a vocational expert. (R. 26-53, 83.) Having considered evidence of Plaintiff's impairments, the ALJ issued an unfavorable decision on August 14, 2008 in which she found that Plaintiff was not under a disability from July 30, 2006 through August 14, 2008. (Id. at 24-25.) On August 15, 2008, Plaintiff timely requested review of the ALJ's decision,

_____

[1]    With respect to Plaintiff's DIB claim, there was an additional issue with regard to her insured status. Because she only acquired sufficient quarters of coverage to remain insured through March 31, 2007 (Tr. 15, 17, 98), Plaintiff had to establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits. See 42 U.S.C. §§ 423(a)(1),(c)(1); 20 C.F.R. §§ 404.101, .131 (2009).

[2]    Fibromyalgia is a condition in which symptoms include pain, fatigue, disturbed sleep, stiffness, and multiple tender spots on the body. Its causes are unknown and it is currently incurable. Its symptoms are entirely subjective, and there are no laboratory tests which can gauge the level of severity of the condition. Wilson v. Apfel, No. Civ. A. 98-6511, 1999 WL 993723 (E.D. Pa. Oct. 19, 1999)(citing Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996)).

[3]    This is, essentially, bursitis in Plaintiff's hips.

which was denied by the Appeals Council on April 24, 2009.  (R.
1-4.)  Thus, the ALJ's decision of August 14, 2008 became the
final decision of the agency.

Plaintiff filed this civil action seeking judicial
review of the Commissioner's decision on June 29, 2009.  The
matter was referred by the Honorable John P. Fullam for
preparation of a Report and Recommendation on January 4, 2010.

## II.  FACTS.

Plaintiff, born on September 17, 1975, was thirty-two
years old[4] at the time of the ALJ's August 14, 2008 decision.
(R. 23, 54.)  Plaintiff obtained her high school general
equivalency degree ("GED") and has past relevant work as a
waitress, warehouse worker, office temp, and country club server.
(Id. at 23, 49, 109, 112, 114-16, 130-36.)  At the time of the
ALJ hearing, Plaintiff resided with her boyfriend of fourteen
years and five children, ages fourteen to six, in a house.[5]  (R.
29-30.)  Plaintiff's youngest children are twins and one of the
twins is a special needs child who is mentally challenged with

---

[4]     Because Plaintiff qualifies as a "younger person" under the
regulations, her age is not considered a significant impediment to adapting to
new work situations.  20 C.F.R. § 416.963(b)(2000).  The Court must
"cautiously scrutinize the employment prospects of so young an individual
before placing h[er] on the disability rolls."  Lockley v. Barnhart, No. 05-
5197, 2006 U.S. Dist. LEXIS 29722, at *2 n.1 (E.D. Pa. May 16, 2006)(Baylson,
J.)(quoting McLamore v. Weinberger, 530 F.2d 572, 574 (4th Cir. 1976)).

[5]     Plaintiff's oldest child is from an earlier relationship, and
Plaintiff and her long-time boyfriend are the parents of Plaintiff's four
youngest children.

mild cerebral palsy and epilepsy.[6]  (R. 35, 180, 201, 205, 229, 291, 229, 236, 244,262, 290, 295.)  Plaintiff is the children's primary caregiver, but she reportedly has a lot of help from her mother and father and brother as well as her boyfriend/fiancee and her boyfriend's mother.  (R. 30.)  Plaintiff's boyfriend reportedly takes care of the house with help from Plaintiff's mother and Plaintiff tries to have the children pick up after themselves.  (Id.)  At the ALJ hearing, Plaintiff stated that she "does some things, just not a whole lot."  (Id.)  She makes sandwiches, but her boyfriend cooks or they eat out.  (Id.)  The longest job Plaintiff ever held was for one year as a restaurant waitress on Fridays and Saturdays.  (Id. at 30-31.)

### A.  Medical Evidence.[7]

#### 1.  Physical Impairments.

In August 2006, Plaintiff began complaining of fatigue and pain in her various joints.  (R. 169.)  Her primary care physician, Joseph Pinciotti, D.O., diagnosed her as having polyathralgias and fibromyalgia, and referred her to Dana Jacobs-Kosmin, M.D., a rheumatologist, for further evaluation and treatment.  (R. 179-80.)  Plaintiff continued seeing Dr. Pinciotti between January 2007 and March 2008 for aches and pains

---

[6]    Plaintiff's child suffered a stroke at ten months of age and was administered the wrong IV dose which resulted in brain damage.  (Tr. 285.) Funds recovered from litigation over this injury are maintained in a trust for Plaintiff's child.  (Id.)

[7]    This information is largely taken from Defendant's brief.

4

in her joints, chronic lumbosacral strain, hyperlipidemia, depression/anxiety and "marital discord." (R. 210-22.)

Dr. Jacobs-Kosmin evaluated Plaintiff in September 2006. (R. 179-84.) Plaintiff complained of pain in her wrists, knees, elbows, and puffy hands. (Id. at 180.) Dr. Jacobs-Kosmin diagnosed Plaintiff with polyathralgias with fatigue, mild rotator cuff syndrome, anxiety with increased blood pressure, and hyperlipidemia. (Id. at 179.) Dr. Jacobs-Kosmin prescribed Naproxyn[8] and recommended that Plaintiff pursue psychiatric treatment, resume therapy, and regular exercise. (Id.)

In a follow-up examination with Dr. Jacobs-Kosmin in December 2006, Plaintiff reported some improvement in her back pain, but she still had some aching in her elbows, wrists, and fingers. (Id. at 330.) Dr. Jacobs-Kosmin noted that Plaintiff had not been exercising and was reluctant to take medications. (Id.) She diagnosed Plaintiff with anxiety disorder, chronic pain syndrome, and resting tachycardia. (Id. at 234, 330.)

In September 2007, Dr. Jacobs-Kosmin noted tenderness in Plaintiff's paraspinal region, shoulders and trochanteric bursae.[9] (Id. at 329.) She diagnosed Plaintiff with chronic

---

[8] Naproxyn is a nonsteroidal anti-inflammatory drug.

[9] A bursa is "a sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop." Dorland's Medical Dictionary, 244 (27th ed. 1988). The trochanter is "either of the two [prominences or projections] below the neck of the femur." Id. at 1760.

pain syndrome, bilateral trochanteric bursitis, and anxiety disorder. (R. 233, 329.) She recommended that Plaintiff take Flexeril, a muscle relaxant, continue her psychiatric therapy and lose weight. (Id.) Dr. Jacobs-Kosmin administered cortisone injections into Plaintiff's bilateral trochanteric bursae. (R. 331.)

In October 2007, Plaintiff underwent a pain management consultation by Jessica Jerrard, D.O., for "multiple somatic complaints" and "all over pain." (R. 229-30.) Plaintiff reportedly took Advil to take the edge off her pain and Vicodin when her pain was severe. (R. 229.) She was "tired every day" and woke up exhausted every morning after sleeping between 2:00 and 5:30 a.m. (Id.) Plaintiff stated she still ran her household and continued to perform housework. (Id.)

Dr. Jerrard reported that Plaintiff's musculature had normal bulk and tone. (R. 230.) She had some tenderness along her lumbar region and trapezius musculature, but otherwise had intact range of motion in her lower extremities, despite decreased fluidity of motion in both her lower extremities and shoulder joints. (Id.) She also had no sensory deficits. (Id.) Dr. Jerrard diagnosed Plaintiff with myofascial pain somatic dysfunction, and possible fibromyalgia and chronic fatigue syndrome. (Id.) She opined that Plaintiff's chronic fatigue could be the result of "poor sleep hygiene." (R. 231.) She

prescribed medication and recommended that Plaintiff re-attempt physical therapy for muscle strengthening and stretching and advised Plaintiff to continue with psychotherapy to help her cope with her day-to-day activities.  (Id.)

In November 2007, Plaintiff returned to Dr. Jacobs-Kosmin complaining that although her hips felt better after the injection in September, 2007, her pain had since returned.  (R. 328.)  She had lumbar pain with flexion, but had full range of motion.  (Id.)  She also had tenderness in her trochanteric bursae. (Id.)  Dr. Jacobs-Kosmin diagnosed Plaintiff with bilateral trochanteric bursitis and chronic pain syndrome. (R. 232, 328.)  She prescribed aerobic exercise, cognitive behavioral treatment, and suggested that Plaintiff be tried on Cymbalta, an antidepressant, because it was helpful in treating fibromyalgia.  (R. 232.)

In March 2008, Dr. Jacobs-Kosmin noted that Plaintiff had a temporary cast on the lower part of her right leg due to a ligament tear in her right foot.  (R. 316-17, 326-27.)  Plaintiff also had tenderness along her back, and continued tenderness in her trochanteric bursae.  (R. 327.)

In a June 9, 2008 medical source statement, Dr. Jacobs-Kosmin listed Plaintiff's diagnoses as fibromyalgia, trochanteric bursitis, and depression.  (R. 337.)  She reported clinical findings of tenderness throughout Plaintiff's spine and

7

tenderness over her greater trochanters bilaterally. (Id.) She estimated that Plaintiff would be absent from work more than three times a month and that her symptoms would "often" interfere with her attention and concentration. (R. 339, 441.) She also estimated that Plaintiff would be limited to lifting and carrying less than ten pounds occasionally, but she did not assess Plaintiff's ability to sit, stand or walk, nor did she assess the percentage of time Plaintiff could grasp, reach, or use her fingers for fine manipulation. (R. 339-41.)

   2.   Mental Impairments.

   Plaintiff has a history of treatment for depression and anxiety. (R. 170-73, 220-22, 246.) In July 2007, Dr. Pinciotti referred Plaintiff to Family Services Association ("FSA") for psychotherapy to address her depression and to assist her in managing the emotional effects of fibromyalgia. (Id. at 237, 242, 304.) On July 24, 2007, Plaintiff was evaluated at FSA by therapist Amy E. Wise, M.Ed. (Id. at 242-67). Plaintiff reported that she felt depressed and tired, had non-restorative sleep and was fearful of leaving her home or driving a car to unfamiliar places. (Id. at 242.) She blamed her erratic work history on the fact that she had five children. (Id. at 255.) She had two close girlfriends for support and she described her family relationships as good. (R. 256.) On examination, Plaintiff was depressed, but her thought process was logical, and

her insight, judgment, and impulse control were good.  (R. 258.)
She had no evidence of a thought disorder and her concentration
and memory were intact.  (Id.)  Ms. Wise diagnosed Plaintiff with
an adjustment disorder with anxiety and depression and noted that
her stressors included "caring for 5 children, one of whom has
special needs."  (Id. at 263.)  She recommended that Plaintiff
attend weekly therapy.  (Id. at 267.)

On August 7, 2007, Waverly Andrews, M.D., a
psychiatrist at FSA evaluated Plaintiff and noted her complaints
of feeling tired and "not feeling well."  (Id. at 201.)
Plaintiff reported spending her days at home watching television
with no motivation for chores, she was easily frustrated with
managing her children and occasional crying.  (Id.)  She had
variable concentration, irritability, fatigue, conflicts with her
boyfriend, and she occasionally felt overwhelmed.  (Id.)
On examination, Plaintiff's mood was tired and her affect tense,
and she was unable to do serial 3's when her concentration was
tested.  (R. 205.)  Her thoughts were logical, her thinking
goal-oriented, and her attention and memory were intact.  (Id.)
Dr. Andrews diagnosed Plaintiff with major depressive disorder,
dysthymia, and anxiety disorder.  (Id.)  He prescribed Lexapro,[10]
and recommended continued therapy.  (R. 206.)

Plaintiff continued seeing Ms. Wise at regular therapy

---

[10]    Lexapro is an antidepressant.

9

sessions through March 2008.  (R. 278-303.)  Ms. Wise's notes
centered on the stress Plaintiff experienced in raising five
children, one with special needs, and with relationship
difficulties between Plaintiff and her boyfriend.  (R. 278-280,
282-86, 290-91, 293-96, 298-301, 303.)  On August 28, 2007,
Plaintiff reported walking her dog for sixty minutes every day,
which gave her some pleasure and time away from her children and
her duties.  (R. 301.)  On September 4, 2007, Plaintiff presented
with more energy and optimism.  (R. 300.)  She continued walking
her dog and attempted to see a girlfriend once or twice a month.
(Id.)  On September 11, 2007, Plaintiff discussed going shopping
as a result of receiving an insurance check, but she worried that
her compulsive shopping would start again.  (R. 298.)  She
reported keeping up with the demands of her children, and that
she was still trying to exercise on a regular basis.  (R. 299.)
On a treatment plan updated on September 24, 2007, Ms. Wise and
Dr. Andrews assessed Plaintiff with a Global Assessment of
Functioning score ("GAF") of 65.[11]  (R. 268.)  On October 8,
2007, Plaintiff still felt depressed, but was managing her life,
including being busy with her five children.  (R. 295.)  On

---

[11]    The GAF scale is used to report the "clinician's judgment of the
individual's overall level of functioning" in light of his psychological,
social, and occupational limitations. American Psychiatric Ass'n, Diagnostic
and Statistical Manual of Mental Disorders, 32 (4th ed. Text Revision 2000).
The GAF ratings range from 1 to 100.  A GAF score between 61 and 70 means that
the individual is experiencing some "some mild symptoms" or some difficulty in
social and occupational functioning," but "generally functioning pretty well."
Id. at 34.

November 26, 2007, Ms. Wise noted that Plaintiff was making progress and that she was maintaining a household with five children, as well as trying to have a satisfying relationship with her boyfriend. (R. 290.)

On December 3, 2007, Plaintiff reported that she stopped taking Lexapro because it gave her headaches. (R. 287.) Ms. Wise noted that Plaintiff appeared stable and was using positive statements when faced with adversity. (R. 287-88.) On December 10, 2007, Plaintiff stated that her mood was stable and that she was managing her chronic pain with physical therapy three times a week. (R. 286.)

On a February 11, 2008 updated treatment plan, Plaintiff was assessed a GAF score of 70. (R. 274.) She was maintaining her responsibilities and managing her depression. (R. 282.) On March 3, 2008, Plaintiff noted that she had seen a physician for treatment and was "much improved since being given meds and counseling." (R. 280.) On March 24, 2008, Ms. Wise reported that Plaintiff was handling all challenges appropriately and maintaining a stable mood and functioning. (R. 278.)

In an April 25, 2008 medical source statement, Dr. Andrews listed Plaintiff's diagnosis as a pain disorder associated with a medical condition. (R. 322.) Dr. Andrews noted that he had seen Plaintiff twice. (R. 201-206, 208, 322.) Plaintiff described her mood as "crappy," her affect was

withdrawn and her concentration was impaired. (R. 323.)
Plaintiff was depressed, had poor self-esteem, decreased
frustration tolerance, and complained of chronic pain with low
energy. (R. 324.) Dr. Andrews estimated that Plaintiff's
impairments would cause her to be absent from work more than
three times a month. (Id.) He also opined that Plaintiff had no
useful ability to remember work-like procedures, maintain
attention for a two hour segment, make simple work related
decisions, deal with normal work stress, or perform at a
consistent pace without an unreasonable number and length of rest
periods. (R. 324-25.)

   **B.   Vocational Expert's Testimony.**

        The ALJ asked the VE to assume work possibilities for a
hypothetical individual with Plaintiff's vocational profile who
was limited to performing light and sedentary work and who needed
"simple, repetitive work, without mandated teams, assembly lines,
or sustained public contact . . . with exertional limits
compatible with the regulatory definition of light work which
includes by definition, sedentary work as well." (R. 49.) The
VE testified that such a hypothetical individual could perform a
significant number of unskilled jobs at the light exertion level
in both the national and regional economies. (R. 49-50.) These
jobs included assembler, laundry worker, and packager. (R.
49-50.)

## III. **LEGAL STANDARD**.

The role of this Court on judicial review is to determine whether there is substantial evidence in the administrative record to support the Commissioner's final decision. Any findings of fact made by the Commissioner must be accepted as conclusive, provided that they are supported by substantial evidence. 42 U.S.C. § 405(g).

"Substantial evidence" is deemed to be such relevant evidence as a reasonable mind might accept as adequate to support a decision. Richardson v. Perales, 402 U.S. 389, 407 (1971)(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). See also Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 113 S.Ct. 1294 (1993). The ALJ must consider all relevant evidence in the record and provide some indication of the evidence he rejected and why he rejected it. See Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). When determining whether the ALJ's decision is supported by substantial evidence, the court may look to any evidence in the record, regardless of whether the ALJ cites to it in his decision. Hook v. Bowen, 677 F. Supp. 305, 306 (M.D. Pa. 1988); Esposito v. Apfel, 66 Soc.Sec.Rep.Ser. 217, 2000 WL 218119, at *6 (E.D. Pa. Feb. 24, 2000). Thus, the issue before this Court is whether the Commissioner's final decision of "not disabled" should be

sustained as being supported by substantial evidence.  Moreover,

apart from the substantial evidence inquiry, a reviewing court

must also ensure that the ALJ applied the proper legal standards

in evaluating a claim of disability.  Coria v. Heckler, 750 F.2d

245 (3d Cir. 1984).

To prove disability, a claimant must demonstrate that

there is some "medically determinable basis for an impairment

that prevents [him] from engaging in any 'substantial gainful

activity' for a statutory twelve-month period."  42 U.S.C. §

423(d)(1).  Each case is evaluated by the Commissioner according

to a five-step process:

> The sequence is essentially as follows: (1)
> if the claimant is currently engaged in
> substantial gainful employment, she will be
> found not disabled; (2) if the claimant does
> not suffer from a "severe impairment," she
> will be found not disabled; (3) if a severe
> impairment meets or equals a listed
> impairment in 20 C.F.R. Part 404, Subpart P,
> Appendix 1 and has lasted or is expected to
> last continually for at least twelve months,
> then the claimant will be found disabled; (4)
> if the severe impairment does not meet prong
> (3), the Commissioner considers the
> claimant's residual functional capacity
> ("RFC") to determine whether she can perform
> work she has done in the past despite the
> severe impairment - if she can, she will be
> found not disabled; and (5) if the claimant
> cannot perform her past work, the
> Commissioner will consider the claimant's
> RFC, age, education, and past work experience
> to determine whether she can perform other
> work which exists in the national economy.
> See id. § 404.1520(b)-(f).

Schaudeck v. Comm'r of Social Sec. Admin., 181 F.3d 429, 431-32

(3d Cir. 1999).

## IV. <u>ALJ DECISION AND PLAINTIFF'S REQUEST FOR REVIEW</u>

According to Plaintiff's application for benefits, her alleged impairment involves an inability to work since July 30, 2006, due to a mood disorder, fatigue, muscle body aches, headaches, anxiety, depression and joint pain.  (R. 54, 56, 60.) The medical evidence indicates that Plaintiff also suffers from fibromyalgia and trochanteric bursitis.  The ALJ, however, proceeded through the sequential evaluation process and determined that Plaintiff was not disabled as a result of her impairments.[12]  The ALJ found that Plaintiff retained the residual functional capacity ("RFC")[13] to perform a wide range of light[14] and sedentary work consistent with the limitations the

---

[12]    The ALJ proceeded through all of the steps, finding that: (1) Plaintiff has not been engaged in substantial gainful activity since July 30, 2008, the alleged onset date; (2) Plaintiff's trochanteric bursitis, fibromyalgia and major depressive disorder are severe impairments; (3) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Plaintiff has the residual functional capacity to perform sedentary and light work, as defined in 20 C.F.R. 404.1567(a) and (b) and 416.9679(a) and (b), with the following abilities and limitations: simple, repetitive tasks only, no mandated teams, no assembly lines, and no sustained public contact.  The ALJ concluded that although Plaintiff was unable to perform any of her past relevant work, she would still be functionally capable of making a vocational adjustment to work that exists in significant numbers in the national economy due to her age, education, work experience, and residual functional capacity.  The ALJ found that transferability of job skills is not an issue because Plaintiff's past relevant work is unskilled.  Thus, the ALJ found Plaintiff was not disabled.  (R. 17-24.)

[13]    RFC is the most that an individual can do despite her limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a).

[14]    Light work involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds, and generally involves a good deal of walking or standing.  20 C.F.R. §§ 404.1567(b), 416.967(b).  Sedentary work involves lifting no more than 10

ALJ presented to the VE. (R. 19, 49.) Based on this RFC and considering Plaintiff's vocational profile and the VE's testimony, the ALJ concluded that Plaintiff could make a vocational adjustment to other work that existed in significant numbers in the national economy. (R. 24.)

In her Request for Review, Plaintiff asserts that: (1) the ALJ committed reversible error by improperly rejecting the well supported opinion of Plaintiff's treating rheumatologist; (2) the ALJ committed reversible error by failing to address Plaintiff's lay witness' testimony; and (3) the ALJ committed reversible error by relying upon an incomplete hypothetical question. The issue before this Court, however, is whether the Commissioner's final decision of "not disabled" should be sustained as being supported by substantial evidence. Nonetheless, each of Plaintiff's arguments are hereafter examined.

## V. <u>DISCUSSION</u>.

### I. **Whether the ALJ Improperly Rejected the Opinion of Plaintiff's Treating Rheumatologist.**

Plaintiff contends that the ALJ erred by failing to afford proper weight to the disability opinion of her treating rheumatologist, Dana Jacobs-Kosmin, M.D. Plaintiff specifically

---

pounds at a time and occasional lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. §§ 404.1567(a), 416.967(a). Sedentary work is primarily performed in a seated position and involves occasional walking and standing. <u>Id.</u>; Social Security Ruling (SSR) 83-10.

contends that great weight should have been given to the conclusions of Dr. Jacobs-Kosmin.

Treating physician reports are to be given special significance. Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000). The Morales court stated, "[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on continuing observation of the patient's condition over a period of time.'" Id. at 317 (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987))). A treating source's medical opinion is entitled to significant weight where the opinion is well-supported by medical evidence and not inconsistent with other substantial evidence. See 20 C.F.R. § 404.1527(d); see also Morales, 225 F.3d at 310, 317 (3d Cir. 2000); Plummer, 186 F.3d at 429. The ultimate disability determination, however, is reserved for the ALJ and a treating physician's opinion on that topic is not entitled to any special significance. Walker v. Barnhart, 2006 WL 1789043, *2 (E.D. Pa. 2006)(citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); SSR 96-5p).

Dr. Jacobs-Kosmin submitted a Medical Source Statement of Functional Abilities and Limitations dated June 9, 2008. (R. 337-41.) Dr. Jacobs-Kosmin confirmed Plaintiff's fibromyalgia

17

diagnosis as well as trochanteric bursitis and depression.  (R. 337.)  She opined that Plaintiff has a "fair" prognosis and identified clinical findings of tenderness throughout the spine and over the greater trochanters bilaterally.  (Id.)  She further identified Plaintiff's symptoms which include multiple tender points, nonrestorative sleep, chronic fatigue, subjective swelling, anxiety, and depression.  (R. 337-38.)  She noted that Plaintiff experiences pain in the lumbosacral, cervical, and thoracic spine, as well as both shoulders, arms, hands/fingers, and hips.  (R. 338.)  She further identified movement/overuse and stress as factors which precipitate Plaintiff's pain.  (R. 339.)  Dr. Jacobs-Kosmin opined that Plaintiff's symptoms often interfere with attention and concentration and Plaintiff's Gabapentin causes sleepiness.  (Id.)

With respect to work-related functions, Dr. Jacobs-Kosmin opined that Plaintiff requires a job which permits her to shift position at will between sitting, standing, and walking.  (R. 340.)  She also opined that Plaintiff would need frequent unscheduled breaks during the workday because of her pain and Plaintiff is limited to lifting only 10 pounds occasionally.  (Id.)  Dr. Jacobs-Kosmin also opined that Plaintiff's impairments would likely cause her to be absent from work more than three times per month.  (R. 341.)

The ALJ articulated her reasoning in applying limited

weight to the opinion of Dr. Jacobs-Kosmin by stating as follows:

> In a medical source statement dated June 9,
> 2007, Dr. Jacobs-Kosmin diagnosed the
> claimant with fibromyalgia, trochanteric
> bursitis and depression (Exhibit 13F). Her
> symptoms included tenderness throughout her
> spine with multiple tender-points. She had
> headaches and chronic pain in multiple parts
> of her body. Dr. Jacobs-Kosmin estimated
> that the claimant would be absent from work
> more than three times per month. However Dr.
> Jacobs-Kosmin did not estimate the claimant's
> ability to sit, stand or walk and did not
> explain how the claimant's condition would
> cause excessive absenteeism (Exhibit 13F).
> It is notable that the claimant had only five
> visits with Dr. Jacobs-Kosmin between
> September 2006 and June 2008 which is very
> infrequent treatment given the claimant's
> allegations of debilitating pain. It is also
> notable that Dr. Jacobs-Kosmin's treatment
> notes do not record symptoms that would
> naturally lead to the residual functional
> capacity in her medical source statement.

(R. 22.)

"Absent persuasive contradictory evidence, the validity of the claimant's symptoms can be conclusively established by the opinion of the treating physician." Smith v. Sullivan, 720 F. Supp. 62, 64 (E.D. Pa. 1989). The treating physician's opinion is entitled to great weight, Gilliland v. Heckler, 786 F.2d 178 (3d Cir. 1986), and cannot be rejected where there is no contrary medical evidence. Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988), Rossi, 602 F.2d at 57. The Commissioner's regulations provide that where the "treating source's opinion on the issue(s) of the nature and severity of [the claimant's]

impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the Commissioner] will give it controlling weight."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Plaintiff contends that the ALJ's explanation for rejecting Dr. Jacobs-Kosmin's opinion was inadequate and therefore erroneous.  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Rocco v. Heckler, F.2d 1348, 1350 (3d Cir. 1987); Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150, 1155 (3d Cir. 1983); Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985); Johnson v. Bowen, 699 F. Supp. 475, 482-83 (E.D. Pa. 1988).  With respect to the ALJ's first reason for rejecting Dr. Jacobs-Kosmin's opinion, that "the claimant had only five visits with Dr. Jacobs-Kosmin between September 2006 and June 2008 which is very infrequent treatment given the claimant's allegations of debilitating pain," Plaintiff contends that this reason is unavailing because the number and frequency of visits is consistent with Dr. Jacobs-Kosmin's own recommendation.  When Dr. Jacobs-Kosmin first saw Plaintiff on December 11, 2006, she recommended that she return in 6 months.  (R. 330.)  Plaintiff returned to Dr. Jacobs-Kosmin's care in September 2007, at which time Dr. Jacobs-Kosmin recommended she return in 2-3 months. (Id. at 329.)  Plaintiff saw Dr. Jacobs-Kosmin again in November

2007, at which time she recommended that Plaintiff return in three months. (R. 328.) Plaintiff saw Dr. Jacobs-Kosmin again in March 2008, at which time Dr. Jacobs-Kosmin recommended she return in six weeks, which would have just before the May 2008 hearing. (R. 327.)

With respect to the ALJ's second reason for rejecting Dr. Jacobs-Kosmin's opinion, that "Dr. Jacobs-Kosmin's treatment notes do not record symptoms that would naturally lead to the residual functional capacity in her medical source statement," Plaintiff correctly notes that this is impermissible speculation on the ALJ's part. The treatment records provided by Dr. Jacobs-Kosmin document the clinical findings cited in her statement and support her opinion, including tenderness throughout the spine and pain with flexion of the lumbar spine. (R. 327-30.) Even with steroid injections, Plaintiff's pain did not subside significantly. (R. 331, 328-29.) Therefore, the ALJ's rejection of Dr. Jacobs-Kosmin's opinion is based upon a lay interpretation of the treatment records, which violates longstanding Third Circuit authority. Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)("an ALJ is not free to set his own expertise against that of physicians who present competent medical evidence.")(citations omitted).

The Commissioner's own regulations state that the opinion of a specialist, commenting about medical issues related

21

to her speciality, is entitled to greater weight than that of a nonspecialist. 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.") In this case, no other medical opinion in the record differs from that of Dr. Jacobs-Kosmin. Dr. Jacobs-Kosmin's opinion is consistent with other substantial evidence in this case.

Dr. Pinciotti, Plaintiff's primary care physician, made clinical findings of pain on palpation, severe fatigue, poor sleep, and severe pain even after epidural steroid injection. (R. 179-83, 216-17, 219, 221-22.) These findings are consistent with those made by Dr. Jacobs- Kosmin. Thus, the Commissioner's argument that Dr. Pinciotti's clinical findings detract from Dr. Jacobs-Kosmin's Statement should be rejected. Similarly, the Commissioner's argument in his brief that "Dr. Pinciotti never identified any functional restrictions nor did he ever state that Plaintiff could not work as a result of her impairments." Def.'s Br., p. 18, was not reasoning utilized by the ALJ to reject Dr. Jacobs-Kosmin's Statement. Plaintiff notes that this reasoning is contrary to Third Circuit authority that silence as to functional limitation indicates only that the physician did not consider the issue. Pl.'s Reply Br., pp. 4-5 (citing Mason v. Shalala, 994 F.2d 1058, 1068-69 n.15 (3d. Cir 1993)(citing Allen

v. Bowen, 881 F.2d 37, 41-42 (3d Cir. 1989)); Kane v. Heckler, 776 F.2d 1130, 1135 (3d Cir. 1985)(silence as to functional limitation indicates only that physician did not consider the issue, not that no limitation exists)).

Plaintiff also contends that the Defendant wrongfully takes out of context Dr. Jerrard's statement that "suggested that Plaintiff's chronic fatigue could have been attributed more to her 'poor sleep hygiene,' rather than to some other cause." Pl.'s Reply Br. at 5 (citing Def.'s Br. at 18 (citing R. 231.)) The full assessment given by Dr. Jerrard is as follows:

> Myofascial pain somatic dysfunction, rule out fibromyalgia, rule out chronic fatigue syndrome. If the patient has not has Epstein-Barr viral titer tested, this should be tested along with a Lyme titer and thyroid function studies. Based upon the patient's history of migraine headaches and chronic fatigue, this certainly may be related to idiopathic migraine and chronic fatigue syndrome; however, due to the patient's social circumstance, poor sleep hygiene may also be in the differential diagnosis of the chronic fatigue.

(R. 230-31). Dr. Jerrard's one-time assessment of Plaintiff noted several possible causes for Plaintiff's chronic fatigue, not that "poor sleep hygiene" was the cause of Plaintiff's fatigue. The Commissioner's attempt to take Dr. Jerrard's assessment out of context is without merit.

The ALJ cited no specific evidence which contradicted Dr. Jacobs-Kosmin's opinion. Therefore, Dr. Jacobs-Kosmin's

opinion should have been given significant weight.  The ALJ's
opinion to the contrary is not supported by the evidence and it
is recommended that the Court should reject the Commissioner's
decision regarding Dr. Jacobs-Kosmin and remand for re-evaluation
of the medical evidence in this case.  Upon remand, the ALJ may
obtain the testimony of an expert regarding fibromyalgia in order
to properly evaluate Plaintiff's medical records and complaints
offered in support of her application for disability.

**II.  Whether the ALJ Erred By Failing to Address Plaintiff's
     Lay Witness' Testimony.**

        Plaintiff next contends that this case should be
remanded because the ALJ did not address the testimony of
Plaintiff's mother, Mrs. Pamela Petro.  (R. 42-49.)  During her
testimony, Mrs. Petro explained that she sees her daughter two to
three times per week, and speaks with her daily.  (R. 42.)  She
described her daughter's decreasing energy level, and stated that
Plaintiff "really isn't able to do the things that she was able
to do."  (Id. at 43.)  She takes Plaintiff to her doctor's
appointments because "with her panic attacks that she has, a lot
of the appointments are in Philadelphia and she just gets
paranoid knowing that she has to drive that distance."  (Id.)
Mrs. Petro further testified that she takes Plaintiff to do her
shopping.  (R. 44.)  When asked to describe in more detail
Plaintiff's problems with driving, Mrs. Petro testified as
follows:

> I'll be driving her and everything and she'll
> say, well, mom why are turning there. And
> I'll say well, this is the way we're going.
> And she'll say, no, no, why do you go so and
> so way. And I'm saying, what's the matter,
> you know. She goes I just do[n't] want to go
> on that road. And it's like she tries all
> the back ways to avoid traffic or a different
> situation. And like I said, we, most of the
> time we end up taking a long way to try to
> get, you know, to point A or point B,
> wherever we're trying to get to.

(R. 47.) She further testified that Plaintiff is:

> very panicky in a car situation. Whenever I
> see, she's very tense and she's always using
> the foot [brake] on her side of the car. An
> actual panic attacks like I said a few times
> that we were at the food store, she just more
> or less stopped and said mom, I've got to get
> out of here. And I said, okay, what's going
> on. She goes, I just got to get out of here.
> So, of course, we left the cart and we went
> on our way. In the car, she'll just - -
> I guess sometimes I'll try to get her to
> drive and she'll end up pulling over and
> saying no, mom you've got to drive it. And
> she just gets like pale looking and just I
> don't even really know how to describe it.
> But it's, you know, I just got to stop. You
> have to drive.

(Id.) With respect to Plaintiff's child with special needs, Mrs. Petro testified that:

> I give her credit because she really does
> what she can do with him. He's very active.
> But, she does have a fiancé that does, you
> know, live with her. And he handles, you
> know, the child also. I take him different
> places just to get him, you know, out of the
> house so it's not a constant struggle for my
> daughter. But she does, like I said, I give
> her a lot of credit that she does what she
> can, for him for his needs.

25

(R. 44).  Mrs. Petro further testified that she, her husband, her son, and her daughter's fiancée help Plaintiff with her familial responsibilities.  (Id.)

Regarding Plaintiff's work history, Mrs. Petro stated that Plaintiff's mental state prevented her from regular employment when she testified:

> She tried, you know, like I said during work.
> But I just think the stress levels of just
> making a go of just going to work every day
> and sitting there and just being tired
> because she always had, well, she's always
> had problems sleeping which doesn't make it
> easy to get up in the morning to try to go to
> a job.  And she has had panic attacks on a
> couple of jobs that she has had because I
> know she called me to go pick her up.

(R. 44-45.)  Mrs. Petro's testimony detailed the extent to which Plaintiff's impairments impact Plaintiff's ability to perform activities of daily living and the level of support she requires from her family.

The ALJ provided a credibility analysis regarding Plaintiff's testimony, and found it inconsistent with the medical record as a whole.  (R. 20.)  The ALJ's decision did not address Mrs. Petro's testimony.  The ALJ mentioned that Mrs. Petro appeared and testified (R. 15), but the ALJ made no credibility finding regarding Mrs. Petro's testimony.  According to Plaintiff, the lack of a proper credibility finding as to Mrs. Petro's testimony constitutes clear reversible error under the law of this Circuit.

Defendant contends that the ALJ properly took into account the subjective statements made by Plaintiff and her mother, noting that although an ALJ must seriously consider a claimant's subjective complaints, it is within the ALJ's discretion to weigh such complaints against the medical evidence and other evidence of record, and reject them.  See 20 C.F.R. §§ 404.1529, 416.929 (explaining how the Commissioner evaluates a claimant's symptoms, including pain); see also Irelan v. Barnhart, 243 F. Supp. 2d 268, 284 (E.D. Pa. 2003)("The ALJ is empowered to evaluate the credibility of witnesses, and his findings on the credibility of claimants 'are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.'")(quoting Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997)).  Defendant argues that although Mrs. Petro may have added more detail to Plaintiff's symptoms and limitations, her testimony was essentially cumulative of information that Plaintiff had already testified to at the hearing.  (R. 29-30, 36-37, 41-42.)  Thus, according to Defendant, the ALJ did not need to explicitly address Mrs. Petro's testimony in her decision, as Mrs. Petro's testimony did not add any new or conflicting information that was not already in the record and addressed by the ALJ.

The ALJ is required to consider and weigh all the

medical reports, and is also required to consider and weigh all of the non-medical evidence before him.  Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983).  Although allegations of pain and other subjective symptoms must be consistent with objective medical evidence, see Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999)(citing 20 C.F.R. § 404.1529), the ALJ must still explain why he is rejecting the testimony.  Van Horn, 717 F.2d at 873.  In this case, the ALJ failed to address the credibility and impact of Plaintiff's mother's testimony.  Although her testimony corresponds with Plaintiff's testimony and provides assistance in evaluating Plaintiff's credibility, the ALJ never discussed this evidence in his evaluation of Plaintiff's credibility. Accordingly, Mrs. Petro's testimony should be addressed on remand, particularly as it buffers and substantiates the testimony of Plaintiff, whom the ALJ did not fully credit.  See Burnett v. Apfel, 220 F.3d 112, 121-122 (3d Cir. 2000).

**III. Whether the ALJ Erroneously Relied Upon an Incomplete Hypothetical Question.**

In order for a hypothetical question to be complete and support the Commissioner's denial of benefits, the question presented to the vocational expert must reflect all of the claimant's impairments supported by the record, and a hypothetical question which omits credibly established limitations is defective and the answer provided cannot constitute substantial evidence.  See Rutherford v. Barnhart, 399

28

F.3d 546, 554 (3d Cir. 2005); <u>Ramirez v. Barnhart</u>, 372 F.3d 546,

554-55 (3d Cir. 2004)(requiring "great specificity" in

hypothetical question); <u>Burns v. Barnhart</u>, 312 F.3d 113, 122 (3d

Cir. 2002); <u>Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3d Cir.

1987); <u>Podedworny v. Harris</u>, 745 F.2d 210, 218 (3d Cir. 1984).

In this case, as discussed above, the ALJ rejected the

limitations in Dr. Jacobs-Kosmin's Statement.  Thus, they were

not incorporated in the ALJ's hypothetical question.

Due to our previous recommendation that this case

should be remanded for re-evaluation of Dr. Jacobs-Kosmin's

opinion, it follows that any re-evaluation would also include re-

examination of the hypothetical to the VE.

**VI.**     <u>**CONCLUSION**</u>.

Based on the record before us, we cannot find

substantial evidence in support of the ALJ's decision that

Plaintiff is not disabled.  On remand, the ALJ should reconsider

Dr. Jacobs-Kosmin's opinion and, if necessary, retain a medical

expert in rheumatology to adequately evaluate Plaintiff's medical

status.  If the ALJ should determine that Plaintiff does not

qualify for disability as a result of her impairment or

combination of impairments, the ALJ must articulate the weight

applied to the evidence and the reasons for rejecting Plaintiff's

claim of disability.[15]  On remand, the ALJ should also, if

necessary, formulate a hypothetical to a VE.[16]  Finally,

Plaintiff should remain cognizant that the ultimate burden of

proving disability rests with her.

Therefore, I make the following:

## RECOMMENDATION

AND NOW, this 30th  day of August, 2010, it is

RESPECTFULLY RECOMMENDED that the Plaintiff's motion for summary

judgment should be GRANTED in part, and the matter should be

REMANDED to the Commissioner in accordance with the fourth

sentence of 42 U.S.C. § 405(g).


BY THE COURT:


*/s/ Henry S. Perkin*
HENRY S. PERKIN,
United States Magistrate Judge


---

[15]  The Third Circuit requires the ALJ to set forth the reasons for his decision.  Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000)(citing Cotter, 642 F.2d at 704-05).

[16]  The Third Circuit has consistently held that because the VE provides opinion as to the claimant's residual functional capacity, the hypotheticals posed to a VE must accurately identify "all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."  Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)(citing Podedworny v. Harris, 745 F.2d 210 (3d Cir. 1984) and Wallace v. Sec'y, 722 F.2d 1150, 1155 (3d Cir. 1983)(stating the expert must have evaluated claimant's particular impairments as contained in the record)).